UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


PATRICK BARNES,

             Petitioner,                                Hon. Janet T. Neff

v.                                              Case No. 1:09-CV-22

WILLIE SMITH,

             Respondent.

_____/


## REPORT AND RECOMMENDATION

        This matter is before the Court on Barnes' petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Barnes' petition be **denied**.


## BACKGROUND

        This matter arises from the November 23, 2005 stabbing of Adam Gibbs. As a result of these events, Petitioner was charged with assault with the intent to commit murder. Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

**Adam Gibbs**

At approximately 1:30 a.m. on November 23, 2005, Gibbs entered Tracey Thayer's residence. (Trial Transcript, April 10, 2006, 165-69). Several other people were present, including Tracey Thayer; Priscilla Cremeans; Adam Gibbs' younger brother, Jake Gibbs; and a friend of Tracey Thayer. (Tr. 166-69, 180). The group "proceeded to just hang out [and] party." (Tr. 169). They were drinking beer, smoking marijuana, and taking Xanax "to get high." (Tr. 169-70).

At approximately 2:00 a.m., Petitioner entered the residence. (Tr. 172-73). Petitioner appeared angry. (Tr. 174). Upon entering the apartment, Petitioner and Tracey Thayer began arguing in the living room. (Tr. 173-74). Gibbs was unclear what the argument was about. (Tr. 173). Petitioner subsequently began arguing with Jake Gibbs. (Tr. 175-76). This argument was about "the way a hat's being worn, gang banging." (Tr. 176). Jake Gibbs was wearing his hat with the brim turned to the right "sort of like what you would see in a rap movie or something." (Tr. 176). Petitioner told Gibbs "to change it." (Tr. 176). Gibbs responded that "he didn't change his hat in prison and he wasn't going to change his hat for him." (Tr. 176-77).

Petitioner and Jake Gibbs were both "starting to get angry" and "it looked like a fight was about to break out." (Tr. 177). Adam Gibbs then told his brother to "leave the apartment because [Jake] was on parole and [Adam] knew something was about to go down." (Tr. 178). Jake Gibbs was reluctant to leave the apartment, but eventually departed. (Tr. 178-79). Adam Gibbs then told Petitioner "to calm down." (Tr. 195). Petitioner responded, saying "something about some gang banging stuff and something about is it worth getting shot over." (Tr. 196). Adam Gibbs then walked over to Petitioner and the two began to fight. (Tr. 179-80, 196). Adam Gibbs blacked out and only later realized that he had been stabbed in the abdomen, at which point he was transported

2

to a hospital.  (Tr. 181-84, 200).  Adam Gibbs was unarmed and did not use any weapons in his fight with Petitioner.  (Tr. 203).

**Jake Gibbs**

In the early morning hours of November 23, 2005, Jake Gibbs went to a party to celebrate his release from prison.  (Trial Transcript, April 10, 2006, 205-08).  Several people were at this party, including his brother, Adam Gibbs; Tracey Thayer; and Priscilla Cremeans.  (Tr. 206-08).  Approximately one or two hours later, Petitioner "just walked in" and started declaring "it was his house."  (Trial Transcript, April 10, 2006, 208-09; Trial Transcript, April 11, 2006, 7).

Jake Gibbs was wearing a baseball hat with the brim turned "to the side."  (Trial Transcript, April 10, 2006, 209-10).  Petitioner told Jake to "turn your hat straight."  (Trial Transcript, April 10, 2006, 209-10; Trial Transcript, April 11, 2006, 8-9).  Petitioner told Gibbs that "he was in a gang and wanted [him] to turn [his] hat straight."  (Trial Transcript, April 10, 2006, 211; Trial Transcript, April 11, 2006, 13).  Gibbs refused, stating, "it's not meaning nothing to me."  (Trial Transcript, April 10, 2006, 211; Trial Transcript, April 11, 2006, 9).  Petitioner began "yelling" and told Jake that "he was going to shoot [him] or something."  (Trial Transcript, April 10, 2006, 211-12; Trial Transcript, April 11, 2006, 13).  Cremeans then pushed Jake Gibbs into the hallway, at which point Petitioner began fighting with Adam Gibbs.  (Trial Transcript, April 10, 2006, 211; Trial Transcript, April 11, 2006, 16-18).

Jake Gibbs stayed in the hallway for approximately five minutes before re-entering the apartment.  (Trial Transcript, April 10, 2006, 213-14).  Upon re-entering the apartment, Jake Gibbs observed that "there was blood all over."  (Tr. 214-15).  Jake Gibbs approached his brother

3

and realized that his brother had been stabbed. (Tr. 214-15). Jake Gibbs carried his brother to their mother's nearby apartment after which Cremeans "called 9-1-1." (Tr. 216-17). Shortly thereafter, Petitioner entered this apartment, at which point Cremeans "grabbed the bat" and "chased" Petitioner out of the apartment. (Tr. 218).

Neither Jake Gibbs nor Adam Gibbs were armed at the time of the incident. (Tr. 223). Jake Gibbs likewise did not observe his brother using any weapon during his fight with Petitioner. (Tr. 223).

**Priscilla Cremeans**

In the early morning hours of November 23, 2005, Cremeans attended a party at Tracey Thayer's apartment. (Trial Transcript, April 11, 2006, 29-30). Several other people were in attendance, including Adam Gibbs and Jake Gibbs. (Tr. 30). Approximately forty-five minutes later, Petitioner "just walked in the house like it was his house." (Tr. 31-32).

Petitioner later told Jake Gibbs that he "didn't like the way [Jake's hat] was turned" and that "it was the wrong way." (Tr. 32-33). Petitioner was "angry" and made mention of "gang stuff." (Tr. 33-34). Petitioner and Gibbs continued arguing for a period of time. (Tr. 33-35). Adam Gibbs eventually "jumped in the middle of it because [Jake] was on parole." (Tr. 35). At this point, Cremeans "took [Jake] into the hallway." (Tr. 35). Approximately three minutes later, Cremeans re-entered the apartment and witnessed Petitioner and Adam Gibbs fighting. (Tr. 36). Tracey was attempting to stop the fight. (Tr. 39). Cremeans then observed Petitioner pick up a knife from the kitchen counter with his left hand and stab Adam "in his right side." (Tr. 36-37). After being stabbed, Gibbs' "intestines were hanging down to. . .a few inches above his knee." (Tr. 39).

4

Cremeans accompanied Adam Gibbs to his mother's apartment where she telephoned the police. (Tr. 40-41). Approximately five minutes later, Petitioner entered this apartment after which Cremeans "chas[ed] him [a] bat to get him out of the apartment." (Tr. 40-42).

**Tracey Thayer**

As of November 23, 2005, Thayer resided in an apartment with Rita Palazola. (Trial Transcript, April 11, 2006, 68-69). Thayer knew Petitioner (a.k.a. Tear Drop) because he had dated Palazola. (Tr. 69-72). The pair had recently broken up, however. (Tr. 71-72).

In the early morning hours of November 23, 2005, Thayer hosted a party at her apartment. (Tr. 72-74). Several people were present, including Jake Gibbs, Adam Gibbs, and Priscilla Cremeans. (Tr. 78-79). Petitioner subsequently arrived at the apartment and asked Thayer if he could accompany her when she went to pick Rita up from work. (Tr. 75-77). However, when Petitioner realized "that people were in the house, he started talking more about the people being in the house saying that it was his house." (Tr. 77).

Petitioner later began arguing with Adam Gibbs. (Tr. 79-80). Because "of the way that [Petitioner] was raising his voice," Thayer was concerned that the pair "could, if it continued, come to blows." (Tr. 94-95). Thayer attempted to break up this fight. (Tr. 95). Thayer was unable to recall what subsequently transpired, but she eventually realized that Adam Gibbs had been stabbed. (Tr. 95-105).

**Nicholas Vaiyanet**

As of November 23, 2005, Vaiyanet was employed as a Lincoln Park Police Officer.

5

(Trial Transcript, April 11, 2006, 150).  Early that morning, Officer Vaiyanet was dispatched to investigate a stabbing.  (Tr. 150-51).  Upon arriving at the location, Officer Vaiyanet was approached by Tracey Thayer.  (Tr. 152).  Thayer told Officer Vaiyanet that Petitioner began arguing with Adam Gibbs and then "grabbed a knife off the kitchen counter and stabbed [him]." (Tr. 152-54).

**Eric Popowicz**

As of November 23, 2005, Popowicz was employed as a Lincoln Park Police Officer. (Trial Transcript, April 11, 2006, 165).  Early that morning, Officer Popowicz was dispatched to investigate a stabbing.  (Tr. 165-66).  When he arrived at the scene, Popowicz heard people repeatedly screaming, "he stabbed him."  (Tr. 166-67).  Officer Popowicz took Petitioner into custody, at which point Petitioner stated, "he stabbed me first."  (Tr. 167).  Popowicz then escorted Petitioner to treat "a small cut to his right index finger."[1]  (Tr. 167-68, 170).  Officer Popowicz observed that Adam Gibbs "had a very large cut across his face" and "a very large cut across the belly."  (Tr. 168).  Officer Popowicz acknowledged that the cut Petitioner suffered to his finger could have been a defensive wound.  (Tr. 170-71).  Popowicz also testified that it was "most definitely" possible that a person could "accidentally cut themselves on the right hand while stabbing someone with the left" hand.  (Tr. 173).

**Raymond Watters**

---

[1]  The parties stipulated that Petitioner suffered a one to two inch laceration on his right index finger that required "two stitches on the inside and nine on the outside."  (Tr. 202).

6

As of November 23, 2005, Watters was employed as a Detective with the Lincoln Park Police Department.  (Trial Transcript, April 11, 2006, 175-76).  Early that morning Detective Watters was dispatched to investigate a stabbing.  (Tr. 176).  As part of his investigation, Watters spoke with Priscilla Cremeans.  (Tr. 183).  Cremeans informed Watters that after arriving at the apartment Petitioner began arguing with Jake Gibbs "about his hat."  (Tr. 184).  Cremeans stated that she later "dragged Jake out of the apartment" and that when she re-entered the apartment she observed Petitioner fighting with Adam Gibbs.  (Tr. 184).  Cremeans informed Detective Watters that she then observed Petitioner "pick up a knife off the counter and stab Adam with it."  (Tr. 184).

Detective Watters later spoke with Petitioner at the police station.  (Tr. 185).  Petitioner was advised of his Miranda rights and declined to answer any questions.  (Tr. 185).  Petitioner then became "very agitated" and stated, "fuck off" and "fuck Adam."  (Tr. 186).  As Watters escorted Petitioner back to his cell, Petitioner stated, "aren't you going to do anything to him?  He stabbed me first."  (Tr. 186).

**Patrick Barnes**

Petitioner arrived at Rita Palazola's apartment in the early morning hours of November 23, 2005.  (Trial Transcript, April 11, 2006, 209-10).  Several people were present in the apartment, including Jake Gibbs; Adam Gibbs; Priscilla Cremeans; and Tracey Thayer.  (Tr. 210-11).  Everybody was "very intoxicated."  (Tr. 212).

Petitioner soon began arguing with Jake Gibbs.  (Tr. 213).  Gibbs "had his hat cocked to the side" and Petitioner "didn't like that."  (Tr. 213).  Petitioner was also upset that Gibbs was "going through the house drunk, intoxicated, yelling gang banger stuff."  (Tr. 213).  Petitioner was

7

upset that Gibbs was "just picking stuff up like it was his house." (Tr. 213-14). Petitioner then told Gibbs that "it was time for him to go." (Tr. 214). Adam Gibbs told Petitioner that it was not his house and that they "don't have to fucking go nowhere." (Tr. 214). Petitioner "told him again, you are going to leave." (Tr. 215).

Adam Gibbs then punched Petitioner in the chest. (Tr. 216). Petitioner "started fighting back" to defend himself. (Tr. 216). This fight "started from the living room and ended up in the kitchen." (Tr. 216). While Petitioner was continuing to fight Adam Gibs, Jake Gibbs approached Petitioner and struck him in the neck and shoulder with a beer bottle. (Tr. 217-18). Approximately one minute later, Jake Gibbs "came up with the knife in his right hand" and "tried to stab" Petitioner. (Tr. 218-19).

Petitioner then began "tussling" with Jake Gibbs to gain control of the knife. (Tr. 219-22). Petitioner eventually grabbed Jake Gibbs' right hand and pulled him towards his body. (Tr. 222-23). Petitioner "smacked" Gibbs' hand causing him to drop the knife. (Tr. 224). Petitioner then "grabbed Adam Gibbs and threw him to the back side of the wall to get him out of the way" after which he "grabbed" Jake Gibbs and "tripped him to the ground." (Tr. 224). Petitioner then noticed that "there was blood everywhere." (Tr. 225). Petitioner testified, however, that he did not stab anybody. (Tr. 225-26).

On cross-examination, Petitioner acknowledged that he was left-handed. (Tr. 239). Petitioner was then questioned about photographs of the crime scene taken immediately following Adam Gibbs' stabbing. (Tr. 157, 241). Petitioner acknowledged that photographs revealed the presence of "a little more than fifty" blood droplets on the kitchen floor. (Tr. 244). Petitioner was unable to explain why these blood droplets were not smeared if Jake Gibbs had been thrown to the

8

floor as Petitioner alleged.  (Tr. 244-45).  When the prosecutor asked Petitioner "if someone fell on the floor, the blood wouldn't look like that, would it?," Petitioner responded, "I guess you're right about that."  (Tr. 244-45).  Petitioner testified that he was "familiar with gangs" and that "when somebody wears their hat to the side" it is "gang related."  (Trial Transcript, April 12, 2006, 7).  Petitioner denied that he was a gang member, but acknowledged that his "gang's name" was tattooed on the back of his neck.  (Tr. 8).

Following the presentation of evidence, the jury found Petitioner guilty of assault with the intent to do great bodily harm less than murder.  (Trial Transcript, April 13, 2006, 19).  Petitioner was sentenced to serve 4-10 years in prison.  *People v. Barnes*, 2007 WL 2847560 at *1 n.1 (Mich. Ct. App., Oct. 2, 2007).  Petitioner appealed his conviction in the Michigan Court of Appeals, asserting the following claims:

> I.    The prosecutor denied the Defendant a fair trial by prejudicial statements and questions.
>
> II.   The competent evidence was not sufficient to overcome the presumption of innocence.

The Michigan Court of Appeals affirmed Petitioner's conviction.  *People v. Barnes*, 2007 WL 2847560 (Mich. Ct. App., Oct. 2, 2007).  Asserting these same two claims, as well as two additional claims, Petitioner moved in the Michigan Supreme Court for leave to appeal.  The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Barnes,* 744 N.W.2d 143 (Mich., Feb. 19, 2008).  On January 12, 2009, Petitioner initiated the present action in which he asserts the same two claims asserted before the Michigan Court of Appeals.

## STANDARD OF REVIEW

Barnes' petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect

that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999).  The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411.  Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable.  *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12.  Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, - - - S.Ct. - - -, 2011 WL 1225705 at *8 (Apr. 4, 2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308.  Accordingly, a decision "adjudicated on the

merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de

12

novo.  *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

**I.**          **Prosecutorial Misconduct**

Petitioner asserts that his right to a fair trial was violated by improper comments that the prosecutor made in his opening statement and closing argument.  Petitioner also claims that his right to a fair trial was violated by certain questions that the prosecutor asked particular witnesses.

When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor." *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).  Thus, even if the challenged comments were improper, habeas relief is available only where the comments "were so flagrant as to render the entire trial fundamentally unfair." *Gillard*, 445 F.3d at 897.

When assessing whether alleged prosecutorial misconduct warrants relief, the Court undertakes a two part analysis.  The Court must first determine whether "the prosecutor's conduct and remarks were improper." *Girts v. Yanai*, 501 F.3d 743, 758-59 (6th Cir. 2007).  If such is the case, the Court must then determine "whether the impropriety was flagrant and thus warrants

reversal." *Id.* at 759.  When assessing whether an improper comment resulted in a denial of the right to a fair trial, the Court considers the following factors: (1) the likelihood that the comments mislead the jury or prejudiced the accused; (2) whether the comments were extensive or isolated; (3) whether the remarks were deliberately or accidentally presented to the jury; and (4) whether the evidence against the accused was substantial.  *Id.*

A.     Opening Statement

In his opening statement the prosecutor stated, "[t]his case is about gang banging." (Trial Transcript, April 10, 2006, 157).  Petitioner claims that this assertion violated his right to a fair trial.

After making the statement in question, the prosecutor stated that the evidence would reveal that on the night in question, Jake Gibbs "had his hat turned in a particular kind of way."  (Tr. 158).  The prosecutor indicated that the evidence would further reveal that Petitioner was in a gang and that he and Jake Gibbs began arguing because Petitioner "didn't like the way [Jake Gibbs'] hat was turned."  (Tr. 158-59).

Adam Gibbs testified that the argument between his brother and Petitioner was about "the way a hat's being worn, gang banging."  (Tr. 176).  Jake Gibbs testified that Petitioner told him that "he was in a gang and wanted [him] to turn [his] hat straight."  (Trial Transcript, April 10, 2006, 211; Trial Transcript, April 11, 2006, 13).  Priscilla Cremeans testified that Petitioner was "angry" and made mention of "gang stuff."  (Trial Transcript, April 11, 2006, 33-34).  Petitioner testified that he was "familiar with gangs" and that "when somebody wears their hat to the side" it is "gang related."  (Trial Transcript, April 12, 2006, 7).  Petitioner also testified that his "gang's name" was

14

tattooed on the back of his neck.  (Tr. 8).

The prosecutor asserted that the case was "about gang banging" and that the evidence would reveal that the incident in question resulted from Petitioner's displeasure, as a gang member, with the way Jake Gibbs was wearing his hat.  The prosecutor presented evidence to support every one of these assertions.  Thus, the Court discerns nothing improper about the challenged comment. Furthermore, even if the statement was somehow improper, such did not violate Petitioner's right to a fair trial, as the statement was isolated and unlikely to have mislead the jury or prejudiced Petitioner.  Moreover, the evidence against Petitioner was substantial.

The Michigan Court of Appeals rejected Petitioner's argument on the ground that the prosecutor's statements were proper and did not violate Petitioner's rights.  *Barnes*, 2007 WL 2847560 at *1.  This conclusion is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, such is not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

### B.      Closing Argument

In his closing argument the prosecuting attorney stated, "this case is about a gang banger and a hat and the senseless crime or senseless violence that's associated with such."  (Trial Transcript, April 12, 2006, 29).  Petitioner asserts that this comment was "plainly improper" and violated his right to a fair trial.

It is appropriate for a prosecutor in closing argument to discuss the evidence and argue reasonable inferences therefrom, so long as such comments do not constitute improper

15

vouching and are not made to inflame the jury. *See United States v. Collins*, 78 F.3d 1021, 1039-1040 (6th Cir. 1996); *United States v. Reliford*, 58 F.3d 247, 250-51 (6th Cir. 1995). As discussed above, the evidence presented at trial supported the prosecutor's statement. The prosecutor did not vouch for the credibility of any witness and it is not reasonable to assert that the comment in question inflamed the jury. The Court, therefore, discerns nothing improper about the challenged comment. Again, even if the statement was somehow improper, such did not violate Petitioner's right to a fair trial, as the statement was isolated and unlikely to have mislead the jury or prejudiced Petitioner. Also, the evidence against Petitioner was substantial.

The Michigan Court of Appeals rejected Petitioner's claim. Specifically, the court found that the prosecutor was "free to argue the evidence and all reasonable inferences arising from it as they related to his theory of the case." *Barnes*, 2007 WL 2847560 at *2. The court further observed that the prosecutor "asked the jury to assess defendant's credibility in light of the knowledge regarding gangs that he demonstrated in his testimony" and did not seek a conviction "by innuendo or by improperly attempting to inflame the jury." *Id.* The denial of Petitioner's claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, such is not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

C.      Examination of Priscilla Cremeans

On re-direct examination the following exchange occurred between the prosecutor and Cremeans:

Q:      Ms. Cremeans, you keep rubbing your hands.  Are you upset?

A:      I'm nervous.  Upset.

Q:      Why?

A:      Because I really didn't want to testify.

Q:      Why not?

A:      I don't want to be part of this, to be honest.

(Trial Transcript, April 11, 2006, 64-65).

Shortly thereafter the following exchange occurred between the prosecutor and Cremeans:

Q:      Why don't you want to be a part of this case, testify?

A:      I'm real nervous.

Q:      Is that the reason?  Because you're scared?

A:      Yes.

Q:      Thank you.

Mr. Anderson:[2]      Objection.  That's leading.

The Court:      Sustained.  Disregard the statement of the witness that she's scared.  Members of the jury, will you do so?

The Jurors:      Yes.

(Tr. 66-67).

Petitioner asserts that "[i]t is apparent that the prosecutor acted in bad faith in making this inquiry."  Petitioner further asserts that "[t]here is indication in the record that the jury was not

_____

[2] James Anderson was Petitioner's trial counsel.

17

able to follow the trial court's instruction to disregard the testimony." Petitioner asserts, therefore, that this line of questioning violated his right to a fair trial.

The Court discerns nothing improper in the challenged line of questioning, as such explored Cremeans' motive for testifying and credibility which are relevant considerations. *See, e.g., Robinson v. Mills*, 592 F.3d 730, 737 (6th Cir. 2010). As for Petitioner's unsubstantiated allegation that the jury failed to follow the trial judge's instructions, jurors are presumed to follow their instructions, *see, e.g., Hill v. Mitchell*, 400 F.3d 308, 325 (6th Cir. 2005), and Petitioner has failed to identify any evidence that the jurors in this instance failed to do so.

The Michigan Court of Appeals rejected this claim, concluding that:

> The prosecutor elicited from Cremeans, without objection, that she kept rubbing her hands because she was nervous, upset, and did not really want to testify. Upon further inquiry regarding whether Cremeans was scared, the trial court sustained defendant's objection to Cremeans's affirmative answer, on the ground that the question was leading, and the trial court instructed the jury to disregard the testimony. It is not apparent that the prosecutor acted in bad faith in making this inquiry. Although the trial court found the use of a leading question to be improper, the reason for a witness's demeanor while testifying, like a witness's motive for testifying, is an appropriate subject for questioning because it can provide clues to the fact-finder regarding whether the witness is telling the truth. Contrary to defendant's argument on appeal, the prosecutor did not suggest that defendant was dangerous. Moreover, the purpose of requiring a timely objection at trial is to give the trial court an opportunity to correct the error. There is no indication in the record that the jury was not able to follow the trial court's instruction to disregard the testimony. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." Therefore, defendant's right to a fair trial was not violated by the prosecutor's questioning of Cremeans.

*Barnes*, 2007 WL 2847560 at *2.

The decision of the Michigan Court of Appeals is neither contrary to, nor involves

18

an unreasonable application of, clearly established federal law.  It is likewise not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

          D.       Examination of Tracey Thayer

On direct examination, the prosecutor asked Thayer "was it your concern when you went to Adam's house [following the fight] at that time to go talk to Adam, Priscilla and Jake or to get away from Mr. Barnes?"  (Trial Transcript, April 11, 2006, 105).  Before Thayer could respond, Petitioner's attorney objected on relevance grounds.  (Tr. 105).  The objection was "sustained" and the prosecutor asked a different question.  (Tr. 105-06).  On re-direct examination, the following exchange occurred between the prosecutor and Thayer:

Q:      Who are you trying to protect?

A:      I'm not trying to protect anybody.

Q:      Are you trying to protect Jake?

A:      No.

Q:      Are you trying to protect Adam?

A:      No.

Q:      Are you trying to protect Mr. Barnes?

A:      No.

(Tr. 139).

Shortly thereafter, the following exchange occurred between the prosecutor and Thayer:

19

> Q:     Who are you trying to protect?
>
> A:     I'm not trying to protect anybody?
>
> Q:     You're pregnant aren't you?
>
> A:     Yes.  I am.
>
> Q:     When's your due date?
>
> A:     July 22nd.
>
> Q:     When did you get pregnant?
>
> A:     At the beginning of -
>
> Q:     (Interposing) In November?
>
> A:     At the end of October?
>
> Q:     Is he the daddy?
>
> A:     No.

(Tr. 144).

Petitioner asserts that the prosecutor's questioning of Thayer "was plainly improper." Petitioner also asserts that "the jury did not follow" the trial court's subsequent instruction that the "lawyer's questions to witnesses are also not evidence."   Petitioner asserts, therefore, that the challenged questions violated his right to a fair trial.

Again, the Court perceives nothing improper about the challenged line of questioning, as such concerned Thayer's potential bias, a relevant and appropriate matter for inquiry. *See, e.g., Robinson*, 592 F.3d at 737.  Thayer testified that while she could remember certain events from the night in question she was unable to recall the incident in which Adam Gibbs was stabbed. In light of such, it was not improper for the prosecutor to inquire of Thayer as to any potential biases

she may have harbored.  As for Petitioner's unsubstantiated allegation that the jury failed to follow

the trial judge's instructions, jurors are presumed to follow their instructions, *see Mitchell*, 400 F.3d

at 325, and Petitioner has failed to identify any evidence that the jurors in this instance failed to do

so.

> The Michigan Court of Appeals rejected this claim, concluding that:
>
> > Finally, we reject defendant's claim that the prosecutor's questioning of Thayer deprived him of a fair trial.  When the prosecutor asked Thayer if she went to Adam's apartment to get away from defendant, the trial court sustained defendant's objection.  The trial court later instructed the jury that the "lawyers' questions to witnesses are also not evidence."  Again, the jury is presumed to have followed the trial court's instruction.
> >
> > The prosecutor's subsequent redirect examination of Thayer, without objection, was not plainly improper.  It is apparent from the record that Thayer's credibility was a matter of concern to both parties, given Thayer's testimony that she had little memory regarding the stabbing incident, that she could not remember providing a written statement to the police, and that the information in her written statement could be false.  Defense counsel cross-examined Thayer regarding her possible motives for testifying as she did.  The inquiries included whether she had any romantic relationship with the victim and whether she wanted to protect the victim, or Jake, from getting into trouble.  The prosecutor's response on redirect examination, regarding whether Thayer was trying to protect anyone and whether defendant was the father of her baby, was not plainly improper.  Any party may attack the credibility of a witness.  Moreover, the jury is presumed to have followed the trial court's later instruction that the lawyers' questions to witnesses should only be considered "as they give meaning to the witnesses answers."

*Barnes*, 2007 WL 2847560 at *3 (internal citations omitted).

> The decision of the Michigan Court of Appeals is neither contrary to, nor involves

an unreasonable application of, clearly established federal law.  It is likewise not based on an

unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim

raises no issue upon which habeas relief may be granted.

II.         **Sufficiency of the Evidence**

Petitioner next asserts that the evidence was insufficient to support his conviction. Petitioner further argues that "the evidence was sufficient to establish that he did act in lawful self-defense."

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury. *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

Pursuant to Michigan law in effect at the time of Adam Gibbs' stabbing, a person was guilty of assault with the intent to do great bodily harm less than murder if the following elements were satisfied: (1) an assault; and (2) a specific intent to do great bodily harm less than murder. *See People v. Bailey*, 549 N.W.2d 325, 331 (Mich. 1996). Moreover, "[o]nce evidence of self-defense is introduced, the prosecutor bears the burden of disproving it beyond a reasonable doubt." *People*

*v. James*, 705 N.W.2d 724, 726 (Mich. Ct. App. 2005).

To prevail on a claim of self-defense, Petitioner had to establish that "he had an honest and reasonable belief that he faced imminent danger of great bodily harm or death and that deadly force was necessary to protect himself." *People v. Campbell*, 2005 WL 1189669 at *2 (Mich. Ct. App., May 19, 2005). However, a defendant cannot avail himself of this defense if he uses "more force than is necessary to defend himself." *People v. Kemp*, 508 N.W.2d 184, 187 (Mich. Ct. App. 1993). Likewise, the defense of self-defense is not available "when a defendant is the aggressor unless he withdraws from any further encounter with the victim and communicates such withdrawal to the victim." *Id.*

Priscilla Cremeans testified that Petitioner picked up a knife from a counter and stabbed Adam Gibbs in the side, after which his intestines "were hanging down. . .a few inches above his knee." When viewed in a light most favorable to the prosecution, this evidence was sufficient for a rational juror to convict Petitioner of assault with the intent to commit great bodily harm less than murder.

With respect to Petitioner's self-defense claim, Adam Gibbs testified that Petitioner spoke of "gang banging" and asked whether it was "worth getting shot over" how Jake Gibbs wore his hat. Adam Gibbs also testified that he was not armed on the night in question and did not use any weapons in his fight with Petitioner. Jake Gibbs testified that Petitioner stated that he was in a gang and that Petitioner threatened to "shoot [him] or something." Jake Gibbs testified that he was not armed and that Adam Gibbs did not use a weapon during his fight with Petitioner. Priscilla Cremeans testified that Petitioner grabbed a knife off a counter and stabbed Adam Gibbs.

Interpreted in a light most favorable to the prosecution, this evidence is sufficient

(despite Petitioner's contrary testimony) for a rational juror to conclude beyond a reasonable doubt that Petitioner's belief that he was in imminent danger of great bodily harm or death and that deadly force was necessary to protect himself was not reasonable and, furthermore, that Petitioner employed more force than was necessary to defend himself.  In sum, the evidence was sufficient for a rational juror to find that the prosecutor disproved beyond a reasonable doubt that Petitioner acted in self-defense.

> The Michigan Court of Appeals rejected this particular claim, concluding that:

> Here, there was testimony that the victim received multiple stab wounds and Cremeans's testimony, if believed, supports an inference that the victim was unarmed and engaged only in a fistfight when defendant picked up the knife and stabbed him in the side.  Although defendant testified that he did not possess a knife and contradicted other testimony presented by the prosecutor, a reviewing court must make credibility choices in support of the jury's verdict.  Contrary to defendant's claim on appeal, there is no basis in the record for taking the credibility determination away from the jury.  Viewed in a light most favorable to the prosecution, the evidence was sufficient to disprove any claim of lawful self-defense to the charge that defendant assaulted the victim with an intent to do great bodily harm less than murder.

*Barnes*, 2007 WL 2847560 at *4 (internal citations omitted).

> This conclusion is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  It is likewise not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

## **CONCLUSION**

> For the reasons articulated herein, the undersigned concludes that Petitioner is not

25

being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that Barnes' petition for writ of habeas corpus be **denied**.  The undersigned further recommends that a certificate of appealability be denied.  *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  June 10, 2011                              /s/ Ellen S. Carmody
                                                 ELLEN S. CARMODY
                                                 United States Magistrate Judge

26